446

PERCY WHISLER *et al.*, *Appellants*, v. JOHN A. WEISS *et al.*,
*Respondents and Cross-appellants.*[1]

*Rummens & Griffin,* for appellants.

*Chadwick, Chadwick & Mills,* for respondents and cross-appellants.

JEFFERS, J.—This action was instituted by Percy Whisler and Mildred Whisler, his wife, against John A. Weiss and Virginia Weiss, his wife, to recover damages for personal injuries claimed to have been received by Mildred Whisler, and for damage to the Whisler automobile, as the result of the negligent operation of defendants' automobile.

[1]Reported in 174 P. (2d) 766.

It is alleged that defendants were negligent, in that on June 24, 1943, plaintiff Mildred Whisler was driving an automobile, the property of plaintiffs, south on Dexter avenue, an arterial highway, in the city of Seattle, and at the same time defendant John Weiss was driving an automobile, owned by defendants, west on Roy street, the vehicles simultaneously approaching a given point within the intersection of the aforesaid avenue and street; that defendant John Weiss carelessly and negligently failed to stop the car which he was driving, as required by law, at the entrance of the intersection, and failed to look out for and give the right of way to the automobile being driven by Mildred Whisler on the arterial highway, and negligently and at an unlawful rate of speed drove within the intersection and there caused the automobile he was driving to collide with the car being driven by plaintiff.

Defendants by their answer denied all allegations of negligence set out in the complaint, and alleged affirmatively that the collision was caused solely by the negligence of plaintiff in failing to keep a proper lookout for approaching cars, in driving her car at an unlawful and reckless rate of speed, and in failing to keep her automobile under control.

Defendants by way of counterclaims alleged that they received personal injuries and that their car was damaged as a result of plaintiffs' negligence, and prayed for judgment against plaintiffs for the injuries and property damages sustained.

Plaintiffs by their reply put in issue the affirmative allegations of the answer.

The cause came on for hearing before the court on June 19, 1944, and after testimony had been received, the court, on June 22, 1944, made and entered findings of fact, conclusions of law, and judgment, wherein the court denied to plaintiffs any relief and dismissed their complaint, but gave judgment to defendants on their cross-complaint. Plaintiffs timely filed a motion to vacate the judgment entered and for a new trial.

On December 19, 1945, the court, after hearing the argument of counsel for the respective parties, made and en-

tered an order and judgment of dismissal, the material parts of which are as follows:

"Now, in conformity with said memorandum opinion

"It Is ORDERED that the motion of plaintiffs to vacate the judgment heretofore entered and for a new trial be and the same hereby is granted to the extent that said judgment be and the same is hereby vacated, and

"This court having determined that each party was guilty of negligence which contributed to and was the *approximate* cause of the collision in question and that neither can recover, the one from the other.

"It Is ORDERED that a new trial be not granted but that said action upon the complaint and cross-complaint be and the same hereby is dismissed and that neither party shall recover the one from the other."

Plaintiffs have appealed and defendants have cross-appealed from the above judgment of dismissal.

Appellants and cross-appellants both state that the question here presented for determination is whether or not either driver is entitled to recover from the other, and if so, in what amount.

It should be kept in mind that this action was tried to the court, and in passing upon the motion to vacate the judgment and for a new trial the court reconsidered all the evidence introduced in the cause, as shown by a very comprehensive memorandum opinion filed herein and made a part of the record.

No question is raised as to the authority of the court to enter the judgment which it did, the only question presented being whether or not the facts and reasonable inferences to be drawn therefrom support the judgment.

The collision occurred within the intersection of Dexter avenue and Roy street, in the city of Seattle. Dexter avenue runs north and south, and is an arterial highway. Roy street runs east and west, and crosses Dexter avenue at right angles. There is an obstruction composed of a building and some poles at the northeast corner of the intersection, which prevents one approaching the intersection from the east from seeing to the north on Dexter avenue until he

has passed the stop sign on Roy street and is out into the intersection.

Dexter avenue is fifty-five feet wide north of the intersection, and seventy-five feet wide south of the intersection. Roy street is forty-four feet wide east of the intersection, and thirty feet wide west of the intersection. There is a caution, or blinker, light over the intersection.

The accident occurred on June 24, 1943, at about seven o'clock p. m. The streets were dry. A plat of the intersection (exhibit No. 17) was admitted in evidence. Just before the collision, John Weiss was approaching the intersection from the east on Roy street. He was accompanied by his wife. Following the Weiss car was one being driven by Frank Fahey. At the same time, Mildred Whisler was driving a car owned by appellants south on Dexter avenue, and was approaching the intersection. She was accompanied by her sister, Myrtle Burke. We shall summarize Mildred Whisler's testimony.

On the evening of the accident, she was driving appellants' 1937 Buick sedan south on Dexter avenue. The car was in good driving condition; the brakes and steering gear were in good condition. Mrs. Whisler and her sister had been to the hairdresser's that afternoon, after which they went to Mrs. Whisler's home, where they had dinner. After dinner they went to Mrs. Whisler's mother's home, and at the time of the accident Mrs. Whisler was on her way down town to pick up her husband when he finished work. We shall now quote from Mrs. Whisler's testimony:

"A. Well, I was driving down Dexter avenue approximately at twenty-five miles an hour, and I looked up and saw this blinker light in the intersection and knew there was an intersection, so I slowed up. *I looked, and there was no cars coming or nothing,* and so I proceeded on, but I had slowed up. Q. How fast were you going at any time in the intersection of Dexter and Roy street? A. Oh, approximately eighteen miles an hour in the intersection. . . . Q. Did you see this car before it struck you? A. Just had a glance of it. Q. How far would you say it was away from you before it hit you that you saw it? How far away was it when you saw it before it hit you? A. *Approximately fifteen feet.* Q. What did you do then? A. Well, I knew he was

going to hit me and I tried to get out of his way. Q. Did you go straight ahead, sideways, or what? A. *Straight ahead, sir.* Q. Where was your car at the time it was struck with respect to the intersection? A. I was in the middle of the intersection. Q. Were you on your own side of the street? A. Yes, sir. . . . Q. What parts of the cars hit each other? A. Well, I didn't see his car after it was hit. Q. What part of your car was hit? A. The middle of the body. . . . Q. Do you have any distinct recollection of what happened after you were hit? A. No, sir." (Italics ours.)

Mrs. Whisler further testified that there was no car in the intersection when she drove into it.

On cross-examination, Mrs. Whisler testified that she did not see the Weiss car by her observation to the front, but saw it for the first time when she was in the middle of the street in the intersection, when she saw the Weiss car coming right towards her from the left and about fifteen feet away.

Mrs. Whisler regained consciousness while her car was lying on its side and before she was taken to the hospital. She did not know where her car finally came to rest after the accident.

Myrtle Burke, Mrs. Whisler's sister, who was riding in the front seat, stated that Mrs. Whisler was driving "Oh, around eighteen to twenty miles an hour or fifteen; I don't know; eighteen, somewhere," at the time they entered the intersection; that she (Mrs. Burke) was looking for traffic and saw no car in the intersection; that she did not see the Weiss car before it hit them.

"Q. What is the first thing you knew about that car? Where was Mrs. Whisler's car— A. (Interposing) The first thing I knew we were upside down in the middle of the street, turned over. Q. You didn't see the car when it hit you at all? A. No. Q. What side of your car did they hit you on? A. The left side. . . . Q. Immediately when it was hit, then, the car just went out of control and went any old way; is that it? A. It just knocked us over, spun us over."

On cross-examination, this witness, when asked who got her out of the car, stated:

"A. There were several men there. I wouldn't know who they were. . . . Q. You did not see any other cars in the

intersection? A. No, sir. Q. What were you talking about as you approached that intersection? A. Mostly about the beauty parlor operator. Q. What was wrong with her? A. Oh, she was just getting a divorce from her husband, and we were talking about that."

Percy Whisler testified that the Whisler car was a total wreck. He was not in the accident, but saw the car after it had been towed to the garage by the police department. Mr. Whisler then described some skid marks he found on the pavement when he visited the scene of the accident about one hour after the collision. He described these marks as starting about a foot past the center line of Roy street, and going in a southwesterly direction to the southwest curb, where the Whisler car came to rest.

John Weiss testified in substance that he was twenty-eight years old, and worked for the Century Brewery; that he had been operating an automobile fourteen or fifteen years. On the evening of the accident he had taken his wife uptown and was returning home; that he was traveling west on Roy street, and, as he approached the stop sign for the intersection, he came to a stop and then put his car in low and started out into the intersection; that he could not see north on Dexter avenue from the stop sign, but had to go out into the intersection. We quote from Mr. Weiss' testimony:

"Q. What did you observe? A. Well, after pulling out into the intersection to view the street, I pulled out into the street, I noticed a car about a hundred and fifty or two hundred feet down the street. Q. What did you do? A. Well, the distance of the car away, I figured it was safe enough to pull across the intersection. Q. And what occurred? A. I was starting, just starting out in low, and I noticed this car coming quite fast there, and the car seemed to be heading for the rear of my car, and so I stepped on the gas to get out of the way, and, looking at the car again, it had swerved to the right, indicating it looked like it was going to hit the front of my car; so I slammed on the brakes and turned to the left to give them as much room as possible. Q. How much of Dexter avenue was left in front of you at that time? A. Just about half of it. Q. You had arrived, then, at just about the center of Dexter avenue? A. Just about the center. Q. And what occurred? A. Well, the veering of this

car, the other car coming from my right, it was right smack in front of me, and it hit my car on the right hand side and pushed me over about four feet to the left. Q. What happened to the other car? A. Well, with the momentum, it started to turn, to skid. Q. Where did it land? A. It landed away on the opposite side of the stop sign on the curb kitty-corner from where I was. Q. That is on the southwest corner of Dexter and Roy? A. That is right."

Mr. Weiss further testified that, after he had turned off the ignition on his car and had lifted his wife up from the floor of the car, he got out of his car and went over to the Whisler car. At this time, the Whisler car was lying on its side facing north, or in the opposite direction from which it had been going.

"Q. What occurred there? A. The car was straightened up after that, and the door was opened, and one woman was taken out. Q. Who was there, if anyone, that you know of? Who assisted in taking them out? A. There was one other gentleman there. Q. Who was that? A. That was Mr. Fahey."

Mr. Weiss then described the injuries sustained by Mrs. Weiss and himself, and the expense incurred in treatment of the injuries.

On cross-examination, Mr. Weiss stated he was familiar with this intersection and knew that Dexter avenue was an arterial; that he was at a point about four feet into the intersection when he looked to the right and saw the Whisler car coming south on Dexter, at which time he judged it to be one hundred fifty to two hundred feet away; that, thinking he had time to cross the intersection, he put his car in low gear and proceeded; that he was next attracted to the Whisler car by the squealing of the brakes, at which time it looked to him like the car was swerving to the left and was going to hit the rear of his car. Weiss estimated the Whisler car was about fifty feet from him when he heard the squealing of the brakes, and the next time he saw the car it was right in front of him.

"Q. Now, let's come back to my question that we started with. Will you explain to the court, with the Whisler car, traveling southerly, and you traveling westerly, what you

mean, and how the Whisler car, the middle and the left rear fender struck your car? A. Well, after observing it moving in toward the left, it swerved again into the right, and the next·moment it was right in front of me and moving my car to the left with the impact."

The witness further testified that his car was skidded about four feet to the left, and the momentum of the Whisler car carried it about forty-two feet to the southwest, where it overturned up against the curb. The front of the Weiss car was a complete wreck, bumper smashed and front of the car smashed in.

Frank Fahey was driving his car west on Roy street close behind the Weiss car. He testified that, when Weiss stopped at the stop sign before entering the intersection, he also stopped. It may be stated here that Mr. Fahey prepared exhibit No. 17, a plat of the intersection. Mr. Fahey stated that the northeast corner of the intersection was a blind corner, and that one could not see north on Dexter avenue until he had pulled out into the intersection about ten feet west of the stop sign. When Weiss started to pull out into the intersection, Fahey followed him, and his attention was first called to the Whisler car by the screeching of its brakes. When he first heard the screeching of the brakes and saw the Whisler car, it was over on the right-hand side of the street traveling south, and was coming fairly fast.

"Q. Then what happened? A. Then I don't know what happened, whether the car intended to make a turn, or whether the car went out of·control, or whether the brakes were not equalized or what; but anyway, she started going off in this direction here. . . . Q. The [Whisler] car started to veer in what direction, Mr. Fahey? A. From my observation she would be starting to turn from the west side of Dexter avenue to the east side of Dexter like she intended to make a turn east on Roy street. Q. And then what happened? A. Well, then there was a collision. Q. What did you do as you observed that situation? A. When this car started coming towards me here, I thought I was going to hit, and I put my car in reverse and backed and kept on going until I was parked alongside the curb on Roy street. Q. The last time you observed the Whisler car had it made any change in direction? A. Yes. When — oh, I would say when it got out here in the intersection, it started going in

the other direction again. Q. And then what happened? A. Well, they hit. Q. What hit as you observed? A. Well, it looked to me, as near as I could tell it looked to me like the Whisler car kind of hooked on to the Weiss car. Q. What parts of the car? A. The front, the front part. Q. The Whisler car hooked the front of the Weiss car? A. Yes. Q. Now, when the cars then came to a position of repose, where was the Weiss car? A. The Weiss car? Well, it was about the middle of the intersection of the street, I would say."

The witness then indicated on exhibit No. 17 the middle of the intersection by the letter "O," and stated that was just about where the front end of the Weiss car was when it came to rest. Mr. Fahey then indicated where the Whisler car came to rest against the curb on the southwest corner of the intersection.

After Fahey had parked his car, he ran over to the Whisler car and turned off the ignition. The Whisler car was then on its side. There were two ladies in the car. Some other men arrived and the car was turned up on its wheels. Mr. Fahey stated that, after the car was righted, the first thing Mrs. Whisler said, outside of complaining of her back, was, "Why didn't that man stop at the stop sign?" to which he replied, "Well, he did stop." Mr. Fahey's testimony continues:

"And I asked her if she was hurt, and the next thing was this other lady criticizing her — . . . Q. What did she say to her? A. She said, 'I told you you were driving too fast.' Q. That is what the other lady said to Mrs. Whisler? A. That is right. Q. And did any other conversation occur there? A. Yes. At the same time she told me that her sister-in-law just got out of a cast. Q. Was anything said about her car having stopped? A. Yes. She said — she made a remark that she had stopped, and her sister-in-law spoke up and said, 'No, you did not stop.' . . . Q. And what was the situation of Mr. Weiss' car, so to speak? A. In regards to what? Q. As to the speed. A. Well, the speed couldn't be very great because he stopped at the stop sign and then he pulled out again, and then he went ahead and stopped, and that is when the accident occurred. He went ahead about the time I backed up."

We may say here that, as we understand the testimony of Mr. Weiss and Mr. Fahey, the Weiss car first stopped at

the stop sign, then it pulled out past the obstruction on the northeast corner and about four feet into the intersection, where Mr. Weiss again stopped, at which time he first observed the Whisler car. Weiss then, concluding that he had time to cross the intersection, started out in low from the point last mentioned and was so proceeding when he heard the screech of the brakes on the Whisler car, at which time he thought it was swerving to the left and that it was going to strike the rear of his car. He stepped on the gas to get out of the way, when the Whisler car swerved to the right. Weiss then put on his brakes, and the collision occurred, the Weiss car at this time having proceeded to a point near the center of the intersection. As indicated on the plat (exhibit No. 17) by Mr. Fahey, the collision occurred about the middle of the intersection north and south, and just about the center of the intersection east and west.

Ervin D. Potter, a Seattle patrolman, was notified by radio of the accident, and with Officer Chivers drove to the scene of the wreck. When he arrived, the two cars were still there, and the Whisler car was still lying on its side on the southwest corner of the intersection up against a light post. Mrs. Whisler had been taken away when he arrived. The officers made some measurements and examined the skid marks. Mr. Potter testified:

"Q. I wish you would explain to the court what investigation you made and what you found with respect to skid marks of each car. A. Well, of Mr. Weiss' car there was one pace of forward skid marks, braking skid marks, and four feet of side skid, that is, would be skidding south; and Mrs. Whisler's car there was fourteen paces of side skid after she was — after the impact to the resting point of the car. Q. That is, the skid mark of fourteen paces to the Whisler car was sideways, was it? A. Southwest, the side skid. Q. And the forward skid mark of the Weiss car indicated one foot of braking — I mean one pace? A. One pace or about three feet."

Mr. Chivers stated that his testimony would be the same as Mr. Potter's.

Mrs. Myrtle Burke, called as a rebuttal witness, denied that following the accident she had stated to Mrs. Whisler,

"I told you you were driving too fast." The witness also stated that she did not hear Mrs. Whisler say, "I stopped," and denied that she (Mrs. Burke) then stated, "No, you did not stop." It will be recalled that the witness Fahey testified to hearing the above statements. Mrs. Burke further testified that she had no conversation with Mr. Fahey; that he was not there.

Mrs. Whisler, called on rebuttal, denied that she was going to turn east on Roy. She also denied that prior to the collision she at any time swerved over to the left-hand side of the street. She also stated that she had never seen Mr. Fahey until the trial.

The testimony in this case is quite typical of the testimony in many of the intersection cases, in that it presents a direct conflict as to the facts claimed to support the contentions of the respective parties.

Appellants contend the trial court erred in not granting appellants an affirmative judgment, and in dismissing their complaint.

It is argued, in support of these contentions, that Mrs. Whisler was the favored driver, being on the arterial; that the two cars here involved were simultaneously approaching a given point in the intersection, and that cross-appellants did not accord to Mrs. Whisler the right of way to which she was entitled; that Mrs. Whisler was guilty of no negligence; and that the negligence of cross-appellant John Weiss was the sole proximate cause of the collision. In support of their contentions, appellants cite Rem. Rev. Stat., Vol. 7A, § 6360-90 [P.P.C. § 295-31]; *Miller v. Asbury,* 13 Wn. (2d) 533, 125 P. (2d) 652; *Billingsley v. Rovig-Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265; *Mathers v. Stephens,* 22 Wn. (2d) 364, 156 P. (2d) 227; and other cases.

On the other hand, cross-appellants contend the court erred in vacating the judgment rendered in their favor and, in support of this contention, argue that this case presents a question of whether or not the so-called "disfavored driver" must, under the rules of law, always be at the mercy of drivers upon arterial highways, particularly where such drivers evidence by their own testimony that they were

giving no consideration or attention to the condition of traffic. It is further contended that the trial court failed to take into consideration the cases holding that the disfavored driver is required to yield only the half of the street upon which the favored driver may lawfully proceed, citing *Hemrich v. Koch,* 177 Wash. 272, 31 P. (2d) 529; *Dyer v. Wallner,* 189 Wash. 486, 65 P. (2d) 1281; *Warren v. Hynes,* 4 Wn. (2d) 128, 102 P. (2d) 691.

Section 6360-90, *supra,* provides:

"The operator of any vehicle shall stop as required by law at the entrance to any intersection with any arterial public highway, and having stopped *shall look out for and give right of way* to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection, whether or not such vehicle first reach and enter the intersection." (Italics ours.)

There is another section of our statute which also has reference to favored and disfavored drivers, to wit, Rem. Rev. Stat., Vol. 7A, § 6360-88 [P.P.C. § 295-27]. This section applies to any public highway intersection, with the exception of arterial public highways, and so far as the duty cast upon the disfavored driver is concerned, is identical with § 6360-90, *supra,* except that it does not require the disfavored driver to stop at the entrance of the intersection. *Billingsley v. Rovig-Temple Co., supra,* cited by appellants, was a case involving an intersection of the type last above referred to. However, we see no reason why the same rules should not be applicable to the parties whether the intersection be of the type covered by § 6360-88 or § 6360-90, except that under § 6360-90 the disfavored driver is required to stop before entering the intersection.

We stated in the *Billingsley* case that no two automobile collision cases are exactly alike, and no fixed rule can be laid down which will specifically cover every variation of fact in different cases. So, cases may be found, such as *Hemrich v. Koch, supra,* where the favored driver on the arterial highway was denied recovery on the theory that Rem. Rev. Stat., § 6362-40 (since repealed), which required the *disfavored* driver, before entering upon an arterial high-

way, to stop when and where posts, signs, or other markers so direct, did not prohibit such driver from entering upon an arterial highway, even though another has the right of way thereon, but it is the duty of one entering an arterial main traveled highway at all times to accord the right of way to vehicles thereon; however, that duty is discharged *when the driver upon the arterial highway is accorded that portion of the street over which he has the right to pass, and is afforded a reasonable opportunity, under all the circumstances, to do so.*

Cross-appellants here contend that the rule last above announced should be applied in construing § 6360-90, *supra,* in the instant case; that cross-appellants complied with such rule and were therefore not guilty of negligence.

In *Miller v. Asbury, supra,* the collision occurred in an intersection of the type described in § 6360-90, *supra.* In the cited case, we emphasized the fact that a disfavored driver entering an intersection of the type described in § 6360-90 shall stop as required by law, and, having stopped, shall look out for and give right of way to any vehicle upon such arterial. The opinion continues:

"Furthermore, the statute, by requiring a stop at the entrance to the intersection, insures the vehicle's arrival at the traveled portion of the arterial at such a slow rate of speed that, even if its operator has for some reason previously failed to detect a car approaching on the arterial, he can still obey the other mandate of the statute and 'give right of way.' In brief, the mandatory commands of the statute to the operator of a vehicle about to enter an arterial are: Stop and give your entire attention to looking for traffic on the arterial, and if you see a vehicle thereon about to cross the same point which you are about to cross, give it the right of way."

In the instant case, the evidence shows that Mr. Weiss stopped at the stop sign before entering the intersection, and, his view to the north on Dexter being obstructed at that point, he proceeded out about four feet into the intersection, where he again stopped, and where he first observed the Whisler car approaching the intersection about one hundred fifty to two hundred feet distant therefrom

and, as Mr. Weiss stated, coming fast. It is from this point that it must be determined whether or not the subsequent acts of Mr. Weiss constituted negligence, which negligence was *the* proximate cause, or *a* proximate cause, of the collision.

Mr. Weiss had at least fifty-one feet to go to clear the traffic lane upon which the Whisler car was then traveling. He had to start from a stop. He was of the opinion that he had time to cross the intersection, so started out in low and then proceeded as hereinbefore set out up to the time of the collision. Had Mr. Weiss remained where he was, that is, at a point four feet in the intersection, or had he moved up even closer to the traffic lane upon which the Whisler car was traveling and stopped, then, in our opinion, he might be justified in contending that he had accorded to the Whisler car a sufficient amount of the right of way. But he did not do this—he started out with the idea of crossing the intersection, and certainly the driver on the arterial would not know that he intended to do other than attempt to cross in front of her.

We are unable to conclude that the trial court was not justified in concluding that Mr. Weiss was guilty of negligence, nor can we say the trial court was not justified in concluding that such negligence was a proximate cause of the collision, prohibiting cross-appellants from recovering on their cross-complaint.

It is true Mrs. Whisler was on the arterial, and we think, under the evidence, it can be said that her car and the Weiss car were simultaneously approaching a given point in the intersection. However, we have often stated that all rights of way are relative, and the duty to avoid accidents or collisions at street intersections rests upon both drivers. While it is true that the primary duty of avoiding accidents rests upon the driver to the left, the favored driver, whether he be such by reason of being on an arterial highway or on the right, cannot proceed to cross an intersection regardless of what conditions may confront him relative to traffic approaching from the left.

It should also be kept in mind that there is a blinker light over the center of this intersection, which is a warning to drivers on the arterial, as well as to drivers on the stop street, to drive cautiously.

In the instant case, the trial court was justified in assuming that Mrs. Whisler, had she been using reasonable care to watch out for traffic as she approached this intersection, could and should have seen the Weiss car when she was at least one hundred fifty feet from the intersection. Had she been exercising such care, she could and should have seen the Weiss car move out into the intersection, apparently with the intention of crossing ahead of her. However, she testified she saw no car in the intersection as she approached it, and did not see the Weiss car until she was near the middle of the intersection, when she first saw it coming directly toward her on the left and about fifteen feet away. Mrs. Whisler's sister did not see the Weiss car at all.

We think the trial court was justified in concluding that Mrs. Whisler and her sister were so engaged in conversation as they approached and entered the intersection that Mrs. Whisler was not paying any attention to traffic which might be in the intersection, for certainly, had she seen the Weiss car, as she could have seen it had she been looking, and had she paid any attention to that car, she should have been advised that it was going to attempt to cross the intersection ahead of her, and this being true, she should have had her car under such control that she could have stopped if necessary to avoid a collision.

The trial court was justified in concluding that Mrs. Whisler, because of her failure to use reasonable care in looking for traffic, did not see the Weiss car until she was in the intersection; that when she did see it she was unable to stop her car, so attempted to swerve to the left and then to the right, and the collision ensued.

Much is said by appellants relative to the testimony of Mr. Fahey, and some of the criticism may be justified, but the trial court saw and heard the witnesses, and we are

not prepared to say that its conclusions were not justified when the whole record is considered.

We are of the opinion there was sufficient evidence in this case to support the conclusion of the trial court that Mrs. Whisler was negligent, and that such negligence contributed to the collision.

The judgment of the trial court is affirmed.

MILLARD, C. J., STEINERT, ROBINSON, SIMPSON, SCHWELLENBACH, and ABEL, JJ., concur.

CONNELLY, J. (dissenting)—I am not able to agree with the majority opinion. This conclusion is based upon the testimony of the litigants and their respective witnesses, and particularly upon the photographs of the plaintiff-appellant's automobile, the plat of the intersection of Roy street and Dexter avenue which was furnished by respondent's witness Fahey, and the itemized bill for repairs to defendant-respondent's automobile, showing, without question, that all of the damage sustained by it in the collision was in the front of the radiator, headlights, and front fenders.

As indicated by the majority opinion, this case involves the respective legal rights of the two parties whose automobiles collided in a street intersection, one of whom, the appellant Mildred Whisler, was proceeding on an arterial highway, and the other, the respondent John Weiss, who entered the highway on the left-hand side of Mrs. Whisler. The automobiles collided on Mrs. Whisler's right side of Dexter avenue, the arterial highway, and about at the center line of Roy street, which intersected the arterial. The collision occurred in the daytime when the weather and visibility were clear. Without any contradiction, it may be stated at the outset that these two automobiles were simultaneously approaching a given point in the intersection, and that Mrs. Whisler, because of her position on the respondent's right and for the further reason that she was proceeding upon an arterial highway, was the favored driver.

The witness Fahey was a fellow employee and close personal friend of the respondents Weiss. They worked at the Century Brewery in Seattle. Fahey was driving to Weiss's home and was following their automobile on Roy street when the collision occurred. He prepared a sketch of the intersection which is reproduced as a part of this opinion. His testimony in this connection is as follows:

"Q. Did you thereafter and at my request make a sketch of that intersection? A. I believe the following morning. Sketch marked: Defendants' Exhibit 17 for identification. Q. I will show you Defendants' Exhibit 17 for identification, and I will ask you if that is the sketch which you prepared yourself of the scene of the accident? A. Yes. Q. Will you then point out to the Court the points of the sketch?"

Witness Ervin D. Potter, a patrolman for the Seattle police department, called by appellant Whisler, testified as follows:

"Q. I wish you would explain to the Court what investigation you made and what you found with respect to skid marks of each car. A. Well, of Mr. Weiss' car there was one pace of forward skid marks, braking skid marks, and four feet of side skid, that is, would be skidding south; and Mrs. Whisler's car there was *fourteen paces of side skid after she was—after the impact to the resting point of the car. Q. That is, the skid mark of fourteen paces to the Whisler car was sideways, was it? A. Southwest, the side skid.* Q. And the forward skid mark of the Weiss car indicated one foot of braking—I mean one pace? A. One pace or about three feet. Q. I suppose about forty-two side skid of the other car? A. Yes." (Italics mine.)

Witness E. E. Chivers, an associate patrolman of Mr. Potter, also called by the appellant, testified to the same material facts. It should be observed that these witnesses are trained in studying the physical facts of automobile accidents, and, which is even more important in this case when one is confronted with the testimony of the witness Fahey, these police officers were wholly disinterested.

No photographs of respondent Weiss's automobile were offered in evidence and none are in the record before us. Defendant's exhibit No. 15 is an itemized statement of the Anderson Buick Company, which repaired respondent's

automobile after the collision. The first item on this state-ment is a new hood. Various other items following are: new hood ornament, removal and repair of the radiator core, new windshield glass, new right-front fender, "new

radiator grill complete," and "straighten front bumper com-plete." Other items requiring repair were the generator, the fan belt, the fuel pump, the fuel lines, the steering sys-tem, and the left-front headlight was replaced.

Photographs of appellants' automobile, taken imme-diately after the collision, show no damage whatsoever to the front end, the headlight and spotlight lenses are intact, the two front fenders, radiator grill, and hood are without damage, but the left-hand center side and door of the auto-mobile were smashed in in such manner as to indicate a violent impact from another automobile. No other conclu-sion is possible under these undisputed physical facts.

As indicated by the plat of the intersection, and the rela-tive positions of the automobiles in their respective courses,

the collision occurred on appellant Mrs. Whisler's own, or right-hand, side of the arterial highway. The side skid marks of forty-two feet start approximately in the center of appellant's right-hand section of Dexter avenue. These side skid marks likewise exclude every conclusion save the obvious one that appellant's automobile was struck violently by respondent's automobile and pushed sideways, a distance of some forty-two feet, to the right-hand curb on Dexter avenue. In the light of these physical facts, the testimony of the respondent and his fellow employee and friend, Mr. Fahey, that the appellant's automobile struck the respondent's automobile somewhere to the left of the center line of Dexter avenue, is neither tenable nor accurate.

The trial court and the majority resolve this case on the theory that the respondent was negligent, but that appellant swerved momentarily from her direct course southerly on Dexter avenue, thus giving the respondent the impression that she intended to turn left in the intersection and proceed on Roy street. As stated, the physical facts of this collision do not bear out this theory. Appellant Mildred Whisler's testimony, when considered in the light of the factual situation revealed by the damage sustained to her automobile and by the skid marks on the pavement as shown by witness Fahey's plat and the traffic policemen's testimony, is, by far, more reasonable than that of the respondent Weiss and his fellow employee Fahey. It was as follows:

"Q. Now, I wish you would tell the Court in your own language just what happened, say, for a distance of about a block before that accident happened, at the time it happened, and afterwards, so far as you know. Just tell the Court how this thing happened. A. Well, I was driving down Dexter Avenue approximately at twenty-five miles an hour, and I looked up and saw this blinker light in the intersection and knew there was an intersection, so I slowed up. I looked, and there was no cars coming or nothing, and so I proceeded on, but I had slowed up. Q. How fast were you going at any time in the intersection of Dexter and Roy Street? A. Oh, approximately eighteen miles an hour in the intersection. Q. At the intersection? A. Yes, sir. Q. Did you see this car before it struck you? A. Just had

a glance of it. Q. How far would you say it was away from you before it hit you that you saw it? How far away was it when you saw it before it hit you? A. Approximately fifteen feet. Q. What did you do then? A. *Well, I knew he was going to hit me and I tried to get out of his way.* Q. *Did you go straight ahead, sideways, or what?* A. *Straight ahead, sir.* Q. *Where was your car at the time it was struck with respect to the intersection?* A. *I was in the middle of the intersection.* Q. *Were you on your own side of the street?* A. *Yes, sir.* Q. Had the wheels of your car passed the center line of the street? MR. CHADWICK: Let the witness answer. That is leading. Q. What part of your car would be at the center line of the street, the front end, the back end, or the middle, or what? A. Well, I was almost in the center. The front end was almost in the middle of the intersection. Q. What part of the car? That car is about twenty feet long. What part of the car would you say would be at the center line? A. The middle of the car. Q. The middle of the car; where would that be with respect to the seat you were sitting in? A. It would be right with me. Q. Right where you were sitting? A. Yes, sir." (Italics mine.)

In view of the terrific force with which appellant's automobile was struck by respondent's, it is difficult to believe that respondent stopped at the entrance to the arterial highway. Whether he stopped, slowed down, or maintained his speed, there is no escape from the conclusion that he caved in the left-hand side of appellant's automobile and pushed it sideways forty-two feet across the intersection to the curb.

The statute measures the respondent's responsibility when entering an arterial highway. It is Rem. Rev. Stat., Vol. 7A, § 6360-90, and provides as follows:

"The operator of any vehicle shall stop as required by law at the entrance to any intersection with any arterial public highway, and having stopped *shall look out for and give right of way to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection, whether or not such vehicle first reach and enter the intersection.*" (Italics mine.)

A very analogous factual situation was presented in the case of *Miller v. Asbury,* 13 Wn. (2d) 533, 538, 125 P. (2d)

652. The following pertinent language was used in the opinion in that case:

"It may well be doubted, considering the matter from the common-law point of view only, whether reasonable minds could arrive at the conclusion that one who took such a chance was acting with due regard for his own safety. But it is unnecessary to pass upon the common-law aspect of the matter, since Miller was so clearly guilty of negligence *per se,* first, in failing to stop at the entrance to the intersection, and, then, in failing to give the right of way to the car rapidly approaching on the arterial highway, which he might easily have done at any time while traversing the thirty feet between the stop sign and the traveled portion of the highway.

"The purpose of the statute is to prevent just such accidents as that described by the evidence in this case. Arterial highways carry fast moving traffic. Numerous accidents will occur unless such highways are entered with care. The legislative policy and purpose are not to permit an operator of a vehicle approaching an arterial, as distinguished from an ordinary, highway, to speculate as to whether he may safely drive into it without stopping. It provides that he shall stop and make certain preliminary observations. The statute is mandatory. It says he '*shall stop as required by law.*' An interval is thus forced upon him, a period during which he is entirely free from the task of operating his own vehicle, and he is told exactly what he must do during that interval, and in equally mandatory language—'*and having stopped shall look out for and give right of way to any vehicles upon such arterial. . . .*' (Italics ours.)

"Furthermore, the statute, by requiring a stop at the entrance to the intersection, insures the vehicle's arrival at the traveled portion of the arterial at such a slow rate of speed that, even if its operator has for some reason previously failed to detect a car approaching on the arterial, he can still obey the other mandate of the statute and 'give right of way.' In brief, the mandatory commands of the statute to the operator of a vehicle about to enter an arterial are: Stop and give your entire attention to looking for traffic on the arterial, and if you see a vehicle thereon about to cross the same point which you are about to cross, give it the right of way. If these commands of the statute are obeyed, it is very difficult to imagine how an accident of the

kind with which we are now dealing can occur, especially at an unobstructed crossing."

In the later case of *Mathers v. Stephens,* 22 Wn. (2d) 364, 156 P. (2d) 227, at p. 370, the court said:

"There are many cases in which we have held, as a matter of law, that the negligence of one violating a statute or ordinance was a proximate cause of an accident, but in those cases the conduct of the party constituting the violation was so clearly a cause thereof that by no process of reasoning could it be said the accident would not have happened if it were not for such conduct. In this case the effect of the statutory negligence of appellant is debatable and open to differences of opinion.

"The factual situation we have outlined warranted the jury finding the respondent was negligent in failing to stop his automobile before entering the intersection and also in crossing the highway where the appellant's automobile was so close to the intersection and its speed was such that he could not do so safely.

"The whole situation is well summed up in what we said in *Reed v. Tacoma R. & P. Co.,* 110 Wash. 334, 188 Pac. 409.

" 'In this case, even assuming prior negligence as charged upon the appellant's daughter, we think it is for the jury to say which of the parties was guilty of that negligence—the last proximate, efficient cause—but for which the accident would not have happened.' "

For the foregoing reasons, I dissent from the opinion filed by the majority and conclude that the appellants Whisler are entitled to recover from the respondent Weiss adequate damages for the personal injuries, and expense incident thereto, which Mrs. Whisler sustained, and that the marital community consisting of the Whislers, husband and wife, is likewise entitled to recover additional damages sustained by them.

The observations contained herein are in full accordance with the views expressed by Judge Simpson in the very recent case of *Angelo v. Lawson, ante,* p. 198, 173 P. (2d) 124.

MALLERY, J., concurs with CONNELLY, J.